[No. B068418. Second Dist., Div. Two. July 27, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JAMES SIRAVO, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II. and III. of the Discussion.

## COUNSEL

Jill Switzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Gerald A. Engler, Morris Beatus and Scott W. Davenport, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BOREN, P. J.**—Michael James Siravo was convicted by a jury of sexually assaulting his wife's housemate. The primary issue on appeal is whether the trial court properly compelled Mrs. Siravo's testimony after she asserted the marital privilege. (Evid. Code, § 970.) We conclude that there is no marital testimonial privilege here because the victim was a "cohabitant" of appellant's spouse. (Evid. Code, § 972, subd. (e).) Thus, we find no error in the trial court's ruling on the issue of privilege, nor in any other ruling as to which appellant claims error, and affirm the judgment.

### FACTS

On the night of December 28, 1985, Jaynee K. was alone in her bedroom when appellant opened the door to her room. She was able to see who it was by the hall light and streetlight which illuminated her room.

The victim, Ms. K., shared an apartment unit with a coworker, appellant's estranged wife, Ingrid Siravo. The victim had encountered appellant in the apartment on a few prior occasions, when he was visiting his wife. Ms. K. was polite to him, but did not see him socially, nor did she have any interest in doing so. On the night of the attack, she heard appellant arrive at the apartment and talk to his wife; then she drifted off to sleep.

When Ms. K. awoke to find appellant in her doorway, she heard him say, "Oh, I guess I've got the wrong room," to which she responded, "Yes, you sure do." She became scared when he entered the room and closed the door. He then jumped on top of her, holding a knife. She tried to push him away, and the knife cut her hand and thumb.

Ms. K. was terrified. She did not try to resist appellant because she was afraid he would use the knife against her. She worried that if she cried out and Ingrid Siravo came upstairs, appellant would hurt both of them. Appellant had intercourse with her while holding the knife at her throat. He forced her to orally copulate him by holding her hair and pushing her head onto his penis, while holding the knife with his other hand. He did each of these sexual acts several times. He was alternatively violent, aggressive and threatening, then romantic. He warned her that he had a knife and she had better do what he said. She cried and begged him not to hurt her. Appellant left after finishing the sexual acts.

As soon as appellant left, the victim called her best friend, who lived nearby. She was crying and could barely speak. She said she had been raped

by Ingrid's husband. The friend instructed Ms. K. to come to her home immediately. Ms. K. went downstairs, told Ingrid Siravo what had happened, and the two of them went to the home of Ms. K.'s friend. Both Mrs. Siravo and Ms. K.'s friend observed that the victim was crying and shaking, and that there was blood on her hands. The victim repeated that she had been raped by appellant, and that he had threatened her with a knife.

The victim spoke to the police, and was taken to the hospital. The attending physician noted that the victim was disheveled and distraught. An examination revealed that the victim had lacerations on her face, neck and hand, and a bite mark on her breast. The lacerations were clearly from the blade of a knife. Semen was found in a rectal swab taken from the victim, though no semen was found in a vaginal swab. Semen and bloodstains were also found on the victim's bedsheets. In addition, a knife was found at the foot of the victim's bed. Mrs. Siravo identified the knife as belonging to appellant.

Appellant was arrested shortly after the attack. On December 30, he spoke to his wife by telephone from jail and asked her to persuade the victim to drop the charges against him. When Mrs. Siravo asked her husband why he had attacked Ms. K., he did not deny committing the crime, and only said, "There is more to it than that, you know." On January 1, 1986, appellant again called his wife, who informed him that the victim absolutely refused to drop the charges. Appellant responded that the victim lacked compassion, and should "show mercy and forgive him." While incarcerated, appellant approached a guard and asked to see a nurse because "I've caught the clap from the bitch I raped."

Appellant failed to appear for trial in November of 1986. A warrant for his arrest issued. Appellant surrendered himself in July of 1991, after spending the interim in Latin America, where he could readily obtain drugs.

At trial, appellant testified that he believed the victim was sexually interested in him. At the time, he was addicted to alcohol and drugs. He recalled going to her room and falling upon her. The victim supposedly asked him to have sexual relations with her. Appellant was not in any condition to perform sexually, so he left. He always carried a sharp knife with him "for Chinese cooking." Appellant admitted calling his wife to have her ask the victim to drop the charges and forgive him.

Appellant did not recall sexually assaulting his wife after threatening her with a knife, tying her up and beating her eight months prior to the attack on Ms. K. He noted that at the time, "I was a sick guy and on the drugs and

alcohol and did bizarre things." Ingrid Siravo subsequently detailed the attack on her that appellant was unable to recall.

Appellant was charged with three counts of forcible rape and three counts of forcible oral copulation. It was specially alleged that appellant used a dangerous and deadly weapon as to each count. The jury found appellant guilty of two counts of rape and two counts of oral copulation. It deadlocked on the two remaining counts. It found the special allegation to be true.

Appellant's motion for a new trial was denied. He was sentenced to a total of twenty-two years in prison, consisting of two consecutive eight-year terms on the rape counts and two consecutive three-year terms for the weapon use enhancements. The sentences he received on the oral copulation counts are concurrent with the rape counts.

DISCUSSION

## I. *Marital Privilege*

At trial, Ingrid Siravo asserted the privilege not to testify against her husband, and the privilege not to be called as a witness against him. (Evid. Code, §§ 970, 971.)[1] The trial court compelled Mrs. Siravo's testimony after concluding that no privilege could be asserted in this case.

■ The exception relied upon by the trial court in rejecting Mrs. Siravo's assertion of the marital privileges is Evidence Code section 972, subdivision (e), which states, "A married person does not have a privilege under this article in . . . [a] criminal proceeding in which one spouse is charged with: (1) A crime against the person or property of the other spouse or of a child, parent, relative, or *cohabitant* of either, whether committed before or during marriage." (Italics added.) The court found that the victim was a cohabitant of Mrs. Siravo. On appeal, appellant argues that a cotenant such as Ms. K. is not a "cohabitant" within the meaning of section 972.

■ To ascertain the meaning of a statute, we begin with the language in which the statute is framed. If the statutory language is clear and unambiguous, the sole function of the court is to enforce the statute according to its

---

[1]Evidence Code section 970 states, "Except as otherwise provided by statute, a married person has a privilege not to testify against his spouse in any proceeding."

Evidence Code section 971 reads, "Except as otherwise provided by statute, a married person whose spouse is a party to a proceeding has a privilege not to be called as a witness by an adverse party to that proceeding without the prior express consent of the spouse having the privilege under this section unless the party calling the spouse does so in good faith without knowledge of the marital relationship."

terms. (*People* v. *Overstreet* (1986) 42 Cal.3d 891, 895 [231 Cal.Rptr. 213, 726 P.2d 1288]; *Leroy T.* v. *Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 434, 438 [115 Cal.Rptr. 761, 525 P.2d 665].) "[W]here the principal problem of construction concerns the meaning of words used in the statute, we must look first to the words themselves (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182-183 [217 P.2d 1]) and must interpret them 'according to the usual, ordinary import of the language employed in framing them.' " (*People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 43 [127 Cal.Rptr. 122, 544 P.2d 1322], citation omitted; *Burnsed* v. *State Bd. of Control* (1987) 189 Cal.App.3d 213, 217 [234 Cal.Rptr. 316].)

The dictionary is the obvious starting point for our inquiry. (See *People* ex rel. *Younger* v. *Superior Court, supra,* 16 Cal.3d at p. 43.) ■ To "cohabit" means "1: to live together as husband and wife usu. without legal marriage having been performed 2a: to live together or in company . . . b: to be intimately together or in company . . . vt: to live together in . . . ." (Webster's New Internat. Dict. (3d ed. 1981) p. 440.) The common thread in the definitions is living together. It may be readily concluded that a cohabitant is someone who lives together with another.

The word "cohabitant" has been used by the Legislature elsewhere in the codes. In the Domestic Violence Prevention Act, for example, " 'Cohabitant' means a person who regularly resides in the household." (Code Civ. Proc., § 542, subd. (c).) This same definition of a cohabitant—as a person who regularly resides in the household—appears in the Family Code. (§ 60, operative Jan. 1, 1994.) In regard to housing for senior citizens, " 'Cohabitant' refers to persons who live together as husband and wife." (Civ. Code, § 51.3, subd. (c)(5).)

The courts have, on numerous occasions, observed that "cohabitation" does not imply the existence of a sexual relationship between cohabitants, even where the statute specifies that the cohabitants must be "husband and wife" (Evid. Code, § 621, Civ. Code, § 4425), "married" (Civ. Code, § 7004), or "any person of the opposite sex" (Pen. Code, § 273.5, subd. (a).) " 'Cohabitation means simply to live or dwell together in the same habitation; evidence of lack of sexual relations is irrelevant.' " (*Michael H.* v. *Gerald D.* (1987) 191 Cal.App.3d 995, 1006 [236 Cal.Rptr. 810], affd. (1989) 491 U.S. 110 [105 L.Ed.2d 91, 109 S.Ct. 2333], quoting *Vincent B.* v. *Joan R.* (1981) 126 Cal.App.3d 619, 623 [179 Cal.Rptr. 9]; People v. *Holifield* (1988) 205 Cal.App.3d 993, 998 [252 Cal.Rptr. 729]; People v. *Ballard* (1988) 203 Cal.App.3d 311, 318 [249 Cal.Rptr. 806].)

It may be deduced from the Legislature's use of the word "cohabit" (and its variants) and interpretive judicial decisions that cohabitation refers,

simply, to people who live or dwell together. In some instances, when the Legislature intended to refer to something more than people living together, it has specified that the cohabitants must have a man-woman relationship, which the courts then interpreted as an intimate or "significant relationship." (*People* v. *Holifield, supra,* 205 Cal.App.3d at p. 999.)

■ Evidence Code section 972 does not specify that the cohabitants be husband and wife, or persons of the opposite sex, or married. Absent any specification of a man-woman relationship, the appropriate definition of cohabitants in this case is two people who live or dwell together in the same household. Ms. K. and Mrs. Siravo, as cotenants, fall into that category.

■ Despite the seeming clarity of the word "cohabitant," as used Evidence Code section 972, appellant contends that the legislative history of the statute evinces an intent to exclude cotenants from its scope. He hypothesizes that the word "cohabitant" means only elderly or dependent adults in the case of section 972 because the legislative bill adding the "parent, relative, or cohabitant" language to the statute in 1986 also amended elder abuse reporting requirements. (Assem. Bill No. 3988, codified as Stats. 1986, ch. 769, § 1, p. 2531.)

Assembly Bill No. 3988 (1) adds "parent, relative, or cohabitant" to the class of individuals outside the scope of the marital privilege in criminal cases, and (2) changes reporting requirements on violence against elder and dependent adults. These two amendments are reasonably germane to one another and have one general object, which is to address the problem of domestic violence and abuse. (Cal. Const., art. IV, § 9; *Harbor* v. *Deukmejian* (1987) 43 Cal.3d 1078, 1097-1098 [240 Cal.Rptr. 569, 742 P.2d 1290].)

Although both portions of the bill address the same general topic of domestic violence, nothing in Assembly Bill No. 3988 suggests that the elder abuse portion may be used to limit or define the marital privilege portion. Absent any such indication, the rule of statutory construction regarding the plain or commonly used meaning of words contained in the statute, which we have discussed above, is controlling.

■ Appellant argues that Evidence Code section 972 should not apply to cohabitants whose relationship is "commercial." We perceive a very good reason for applying this law to all cohabitants, regardless of the nature of their relationship. Individuals are uniquely vulnerable in their domestic environment. This case offers a perfect example of that vulnerability. The victim was attacked while sleeping in her own bedroom. Her assailant had easy, unimpeded access to her bedroom due to his marital relationship with

the victim's cohabitant. Ms. K. was exposed to the risk of attack by her cohabitant's partner, who cornered the defenseless victim in the place where she is entitled to feel the most secure: at home. The Legislature may well have determined that because of the particular vulnerability of individuals in their own homes, the marital privilege should not apply to criminal acts against cohabitants.

■ As respondent correctly observes, it is unlikely in any event that Mrs. Siravo's compelled testimony played a central role in the jury's ultimate decision to vote for conviction, given the abundant evidence of his guilt. Numerous witnesses, including Ms. K.'s best friend and the emergency room physician, saw that the victim was crying, trembling, distraught and disheveled. Ms. K., while still under the stress of excitement caused by the event, told her friend that she had been raped by appellant. (Evid. Code, § 1240.) The victim was bloodied by knife cuts. Appellant's knife was found on the victim's bed. Appellant admitted to entering the victim's bedroom, to carrying a sharp knife with him, and to trying to convince the victim to forgive him and drop the charges against him. He fled the country after being charged, showing a consciousness of guilt. He told a prison guard that he caught a sexually transmitted disease from the woman whom, in his words, he "raped." In short, even without Mrs. Siravo's testimony, the evidence against appellant was overwhelming. If there was any error in admitting her testimony, the error was clearly harmless.

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Gates, J., and Nott, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 21, 1993. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 555.