[No. B138551. Second Dist., Div. Five. May 22, 2001.]

PATRICIA A. COCHRAN, Plaintiff, Cross-complainant and Appellant, v. JOHNNIE L. COCHRAN, JR., Defendant, Cross-defendant and Respondent.

[Opinion certified for partial publication.*]

---

*Under California Rules of Court, rules 976(b) and 976.1, only sections I, II, IV, V.B.3, and VI are certified for publication.

**COUNSEL**

Law Office of Tony J. Tanke, Tony J. Tanke; Law Offices of Joseph W. Carcione, Jr., and Joseph W. Carcione, Jr., for Plaintiff, Cross-complainant and Appellant.

Fogel, Feldman, Ostrov, Ringler & Klevens, Larry R. Feldman, Lester G. Ostrov, Lawrence C. Jones and John T. Fogarty for Defendant, Cross-defendant and Respondent.

OPINION

WILLHITE, J.*—

## I. INTRODUCTION

Plaintiff and cross-complainant Patricia A. Cochran appeals from the judgment of dismissal entered after the trial court sustained without leave to amend the demurrers which defendant and cross-defendant Johnnie L. Cochran, Jr., brought to her cross-complaint for rescission of their 1983 property settlement agreement.[1] She also appeals from the summary judgment entered for the defendant on her complaint for breach of an alleged agreement for lifetime support. For the reasons set forth below, we reverse both judgments.

## II. PROCEDURAL HISTORY

This is the third appeal arising from two separate, but related, actions between appellant Patricia A. Cochran (appellant) and respondent Johnnie L. Cochran, Jr. (respondent) arising out of their long-term, nonmarital relationship.

The first action (Super. Ct. L.A. County, 1995, No. BC124156) was filed in March 1995. The operative, first amended complaint of April 1995 was primarily concerned with respondent's alleged breach of a supposed *Marvin*[2] agreement to provide appellant with lifetime support. In *Cochran v. Cochran* (1997) 56 Cal.App.4th 1115 [66 Cal.Rptr.2d 337] (*Cochran I*), we held that the statute of limitations for breach of a *Marvin* agreement did not begin to run until the defendant failed to perform as the agreement required. (*Id.* at p. 1124.) As a result of our decision, all that remained of the complaint in *Cochran I* were causes of action based on the alleged *Marvin* agreement.

The second action (Super. Ct. L.A. County, 1996, No. EC021315) was filed in November 1996 while the appeal in *Cochran I* was still pending. The original complaint in the second action included a cause of action seeking to rescind a 1983 property settlement agreement because the agreement was induced by fraud. The operative first amended complaint omitted the rescission claim, but sought damages for intentional infliction of emotional distress based on a message left on a telephone answering machine which

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] See footnote 3, *post.*

[2] *Marvin v. Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106].

appellant construed as a death threat. In *Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 498-499 [76 Cal.Rptr.2d 540] (*Cochran II*), we held that the message was not actionable as a death threat.

After our decision in *Cochran I* became final, that action was remanded to the trial court. On January 26, 1998, respondent cross-complained against appellant, contending she had breached the confidentiality provisions of their 1983 property settlement agreement by appearing on television to discuss their relationship. Appellant answered the cross-complaint on February 11, 1998, and filed a cross-complaint of her own (the fraud cross-complaint), seeking to rescind the 1983 settlement agreement because it allegedly had been induced by respondent's fraud. Respondent dismissed his cross-complaint without prejudice on March 13, 1998. He then demurred to the fraud cross-complaint, contending among other things that it was barred by the statute of limitations and was contrary to certain verified allegations in the *Cochran I* complaint concerning the validity of the settlement agreement. By minute order dated April 2, 1999, the trial court sustained the demurrers without leave to amend on two grounds: (1) the fraud cross-complaint was barred by appellant's earlier allegations; and (2) the action was also barred under the law of the case doctrine by our decision in *Cochran I*.[3]

In November 1999 respondent moved for summary judgment on the *Cochran I* complaint, contending appellant could not prevail on her remaining *Marvin* claims because: (1) the parties were not cohabiting when the agreement was made; (2) the alleged promise of support was made under circumstances which made it unreasonable to believe the statements were a contractual offer; (3) the alleged promise to support was too uncertain to be enforced; and (4) in any event, the claim was barred by the statute of limitations. The motion was granted and judgment for respondent was entered December 21, 1999. This appeal followed.

III.  DEMURRER STANDARD OF REVIEW*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[3]The record does not show that a written order of dismissal or judgment on the fraud cross-complaint were ever entered. Instead, the April 2 minute order sustaining the demurrers is the only ruling contained in the record. That order is not appealable. However, the matter is fully briefed and respondent has not objected or moved to dismiss that portion of the appeal. In the interests of judicial economy, we will order entry of judgment nunc pro tunc on the fraud cross-complaint and deem the appeal to be taken from that judgment. (*Parker v. Robert E. McKee, Inc.* (1992) 3 Cal.App.4th 512, 514, fn. 1 [4 Cal.Rptr.2d 347]; *Dominguez v. City of Alhambra* (1981) 118 Cal.App.3d 237, 242 [173 Cal.Rptr. 345].)

*See footnote, *ante*, page 283.

## IV. Summary Judgment Standard of Review

■ Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) In reviewing an order granting summary judgment, we must assume the role of the trial court and redetermine the merits of the motion. In doing so, we must strictly scrutinize the moving party's papers. The declarations of the party opposing summary judgment, however, are liberally construed to determine the existence of triable issues of fact. All doubts as to whether any material, triable, issues of fact exist are to be resolved in favor of the party opposing summary judgment. While the appellate court must review a summary judgment motion by the same standards as the trial court, it must independently determine as a matter of law the construction and effect of the facts presented. (*Barber v. Marina Sailing, Inc.* (1995) 36 Cal.App.4th 558, 562 [42 Cal.Rptr.2d 697].)

■ A defendant moving for summary judgment meets his burden of proof showing that there is no merit to a cause of action if that party has shown that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (o)(2).) Once the defendant does so, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or to a defense to the cause of action. In doing so, the plaintiff cannot rely on the mere allegations or denial of his pleadings, "but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (*Ibid.*; see *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 590 [37 Cal.Rptr.2d 653].)

### A. *Summary Judgment Facts*

Appellant and respondent began their relationship in 1966, at a time when respondent was still married to his first wife. Appellant later changed her surname to match respondent's. In 1973, the parties' son was born. In 1974, appellant and respondent bought a house in North Hollywood. Title was eventually placed in both their names as joint tenants. Respondent also owned a home on Hobart Street. He and appellant split their living time between the two homes. Respondent stayed with appellant and their son at the North Hollywood home from two to four nights a week. He kept clothes there and took meals at the house. Respondent held himself out to the world as appellant's husband. In 1978, respondent divorced his first wife.

In 1983, they experienced relationship troubles after appellant learned respondent was unfaithful. On October 21, 1983, they signed the property

settlement agreement. Pursuant to the settlement agreement, respondent quitclaimed to appellant all his interest in their North Hollywood house. He agreed, among other things, to pay child support of $350 each month, to buy appellant a new car, to pay for construction of a swimming pool at the North Hollywood house, and to provide medical and dental insurance for their son. The agreement was expressly limited to claims then existing and included assurances of full disclosure as to all assets then owned by the parties. It did not include a waiver or release of future or unknown claims. (Civ. Code, § 1542.)

Within one to three weeks of signing the settlement agreement, respondent told appellant he wanted to keep things as they had been before. He also promised to care for her "financially, emotionally and legally" for the rest of her life. In return, she agreed to maintain their home and care for respondent and their son.[5] After that time, he continued to live with appellant and her son "as he had before." Appellant said respondent "wanted me to continue providing a home and continue our lifestyle and he was going to continue supporting me." The support agreement was formed as part of discussions about the future of their relationship, their continued love for each other, and their desire to eventually marry. Appellant said she wanted proof of respondent's fidelity before marriage, "so we were working on that."

Appellant said in her declaration that after the support agreement was formed, respondent "continued to live with me and our son at the [North Hollywood] house as he had done before. . . . He continued to support me as he had promised until February 1995." Much of respondent's summary judgment motion centered on the form of that support, and whether it was sufficient to make the agreement enforceable or was so sporadic that it constituted a breach of the agreement which set the statute of limitations running by 1985.

In 1985, respondent married his second wife. Between 1984 and late 1992 or January 1993, appellant worked for a company named Ipson. During those years, respondent helped pay for various of appellant's expenses. He gave her cash and paid her bills as needed, including utilities and medical insurance. He twice provided her with new cars and sometimes paid for car repairs. Respondent also gave appellant credit cards issued in either her name or respondent's, with respondent paying the charges she incurred. During those years, respondent "paid child support for [their son] . . . and gave me money whenever I needed it. [Respondent] paid amounts over the

---

[5]Respondent's summary judgment motion did not dispute appellant's assertion that respondent made such a promise. For ease of reference, we will refer to the agreement which appellant contends she entered as "the support agreement."

$350.00 required in the [1983] Settlement Agreement because he and I understood that more was required to maintain the standard of living to which me [*sic*] and our son were accustomed. Throughout this period of time, [respondent] and I spoke on a regular basis and [respondent] knew what my financial needs were. When I needed funds he always provided funds as he promised." Cancelled checks produced by respondent showed child support payments of $1,000 were made at least as of 1991 through January 1995. A notice from appellant's bank showed that respondent wrote her a check for $4,500 in or about May 1991. However, appellant admitted that the support she received was not regular, either in amount or time of payment.

At respondent's behest, on or about January 1993, appellant left her job at Ipson. After that, in accord with the support agreement, respondent provided regular, monthly support checks for appellant. Respondent also made direct deposits to appellant's bank account. Appellant testified that the total was between $3,500 and $4,000 each month. Respondent also gave appellant cash, paid her credit card bills, car expenses, medical insurance, and cellular phone bills. Respondent concedes he provided regular support for appellant after she left her job, but contends he agreed to do so at his son's request only until appellant got another job.

Respondent produced copies of more than 200 cancelled checks in connection with payments made to appellant or their son between September 1990 and December 1998. Many were made payable to appellant, but bore notations indicating they were for child support or other expenses related to the parties' son. Several were payable to appellant herself: a July 1993 deposit of $1,500 to appellant's bank account; an August 1993 check for $375; a September 1993 check for $1,500 bearing the notation "Expenses"; and many others between January 1994 and February 1995 in amounts ranging from $1,800 to $3,557. Respondent admitted that he was unsure whether the checks he produced were all those relating to the support of either appellant or their son. He admitted that there might be other checks written on different accounts.

## V.  DISCUSSION

### A.  *Demurrer to Fraud Cross-complaint**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

*See footnote, *ante*, page 283.

B. *Summary Judgment on Marvin Claim*

1., 2.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

3. *Cohabitation*

■ Respondent also contends that the support agreement is unenforceable because he and appellant did not cohabitate, or live together. Viewing the evidence in appellant's favor, it appears that before entering the 1983 settlement and support agreements, respondent stayed at the North Hollywood house two to four nights a week. Appellant and the parties' son sometimes stayed at respondent's house on Hobart Street. Appellant stated in her declaration that after respondent made his support promises, he continued to live with her as he had before. However, from her deposition testimony it is apparent that after respondent remarried in 1985, he stayed at the house less often. Appellant testified she was not sure whether respondent ever spent the night after his remarriage, although he did come for frequent visits, with appellant continuing to prepare his meals.

The *Marvin* court held "that adults who voluntarily *live together* and engage in sexual relations are nonetheless as competent as any other persons to contract respecting their earnings and property rights." (*Marvin v. Marvin, supra,* 18 Cal.3d at p. 674, italics added.) So long as the agreement does not depend upon meretricious sexual relations for its consideration, or so long as that portion of the consideration may be severed from other proper forms of consideration, such agreements are enforceable. (*Ibid.*)

In *Taylor v. Fields* (1986) 178 Cal.App.3d 653 [224 Cal.Rptr. 186] (*Taylor*), the court seized upon the italicized "live together" reference in *Marvin* to hold that a dead man's mistress, who never lived with the decedent, was not entitled to enforce their purported *Marvin* agreement. Examining *Marvin* and other related decisions, the *Taylor* court held that cohabitation was a prerequisite to recovery under *Marvin.* Because the appellant's agreement in *Taylor* rested upon an illicit sexual relationship for its consideration, it was not enforceable. (*Taylor, supra,* 178 Cal.App.3d at pp. 660-665.)

*Taylor* was followed by *Bergen v. Wood* (1993) 14 Cal.App.4th 854 [18 Cal.Rptr.2d 75] (*Bergen*). The plaintiff in *Bergen* had a long-term sexual relationship with the decedent, acting as his hostess and social companion.

*See footnote, *ante,* page 283.

Though he had supposedly promised to support the plaintiff, they never lived together. In reversing a judgment for the plaintiff, the *Bergen* court noted that cohabitation was required under *Marvin* "not in and of itself, but rather, because from cohabitation flows the rendition of domestic services, which services amount to lawful consideration for a contract between the parties. [¶] We make the additional observation that if cohabitation were not a prerequisite to recovery, every dating relationship would have the potential for giving rise to such claims, a result no one favors." (*Id.* at p. 858.) Citing both *Marvin* and *Taylor,* the *Bergen* court noted that recovery under *Marvin* "requires a showing of a stable and significant relationship arising out of cohabitation." (*Id.* at p. 857.) Because the plaintiff never lived with her decedent, it was impossible to sever the sexual component of their relationship from other appropriate consideration. (*Id.* at p. 858.)

Citing *Taylor* and *Bergen*, respondent contends that his relationship with appellant did not involve cohabitation, since the evidence showed that he spent as little as one night a week at appellant's house after their property settlement agreement was reached in 1983. As a result, he characterizes their relationship as no more than "dating." On the other hand, appellant relies on *Bergen*'s statement that cohabitation was required not in and of itself, but in order to establish lawful consideration through the performance of domestic services. Since appellant provided such services, she contends there was lawful consideration even absent cohabitation. Alternatively, she contends that there was sufficient evidence to raise a triable issue of fact as to the issue of cohabitation.

We save for another day the issue whether consenting adults need cohabit *at all* in order to enter an enforceable agreement regarding their earnings and property. Assuming for discussion's sake that cohabitation is required, we conclude that the rationale of *Marvin* is satisfied in appropriate cases by a cohabitation arrangement that is less than full-time. Here, as so construed, there was sufficient evidence to raise a triable issue of fact on the cohabitation element.

Both *Taylor* and *Bergen* considered claims by parties who served, in effect, as the mistress or girlfriend of their respective decedents. Neither plaintiff had *ever* cohabited with their respective decedents. Moreover, neither decision considered whether anything less than a full-time living arrangement was necessary to show cohabitation. By contrast, in the present case, when respondent supposedly entered the support agreement in late October or early November of 1983, he and appellant had shared a relationship for approximately 17 years. That relationship produced a son, whom they were raising together. They held themselves out to the world as husband

and wife. Appellant legally changed her surname to respondent's. They had jointly owned their home until respondent quitclaimed his interest as part of their settlement agreement. Appellant performed a variety of domestic chores for respondent, including raising their son and maintaining the house. Respondent kept clothes at the house, "spent family time there" and "slept there on a regular basis."

At common law, the term "cohabitation" means to live together as husband and wife. (*People v. Ballard* (1988) 203 Cal.App.3d 311, 317-318 [249 Cal.Rptr. 806] (*Ballard*).) Various criminal law decisions have construed this common law meaning in the context of reviewing convictions of inflicting corporal injury on a cohabitant. (Pen. Code, § 273.5.) These decisions all conclude that cohabitation may exist even if the cohabitants do not live together full-time. In *Ballard*, after examining the common law definition of cohabitation, the court held that even though the defendant maintained a separate apartment, there was sufficient evidence of cohabitation. The court cited evidence that the defendant and his victim had lived together for two years, slept together in one bed, and were often together. (*Ballard, supra,* 203 Cal.App.3d at pp. 314, 317-318.) In *People v. Holifield* (1988) 205 Cal.App.3d 993 [252 Cal.Rptr. 729], the defendant and his victim had seen each other "off and on" for four years. In the three months before the assault, the defendant stayed in at least three other places for weeks at a time, taking his possessions with him whenever he left. He stored clothes and personal items at three other homes and did not have a key to the victim's room. They did not share rent or make joint purchases, did not spend much free time together and had infrequent sexual relations. On those facts, the court upheld a finding that the two were cohabiting. (*Id.* at pp. 995-996, 1002.)

Finally, in *People v. Moore* (1996) 44 Cal.App.4th 1323 [52 Cal.Rptr.2d 256] (*Moore*), the court considered whether a defendant could be deemed a cohabitant with his victim when he was cohabiting with someone else at a different location during the same time frame. Synthesizing *Ballard, Holifield,* and other decisions, the court held that cohabitation under Penal Code section 273.5 occurred where the defendant maintained a substantial relationship with his victim and lived with her part of the time, even though he had a similar relationship with another woman, and lived part of the time with her. The court reasoned that the defendant should not be able to immunize himself from criminal liability for injuring a cohabitant simply because he lived part-time somewhere else with another. (44 Cal.App.4th at pp. 1333-1335.)

We find these decisions both persuasive and analogous on the issue of cohabitation in the context of a *Marvin* agreement. The purpose of *Marvin*

was to permit parties to a significant and stable relationship to contract concerning their earnings and property rights. "So long as the agreement does not rest upon illicit meretricious consideration, the parties may order their economic affairs as they choose . . . ." (*Marvin v. Marvin, supra,* 18 Cal.3d at p. 674.) To require nothing short of full-time cohabitation before enforcing an agreement would defeat the reasonable expectations of persons who may clearly enjoy a significant and stable relationship arising from cohabitation, albeit less than a full-time living arrangement. For instance, it would exclude otherwise valid support agreements made by parties who, perhaps because their jobs are geographically far apart, maintain a part-time residence for one party, and also a second residence where at times they live jointly. Certainly the rationale of *Marvin* does not support such a result.

Here, the parties had shared a long-term, stable and significant relationship. In this context, evidence that they lived together two to four days a week both before and at the time they entered their *Marvin* agreement is sufficient to raise a triable issue of fact that they cohabitated under *Marvin.*

4. *Reliance**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## VI.   DISPOSITION

For the reasons set forth above, we direct the trial court to enter nunc pro tunc a judgment dismissing the fraud cross-complaint based upon its orders sustaining respondent's demurrers to that pleading. To the extent appellant appeals from the order sustaining those demurrers, we deem the appeal to be taken from that judgment. The judgment of dismissal on the fraud cross-complaint and the summary judgment on the complaint are reversed. Appellant to recover her costs on appeal.

Turner, P. J., and Armstrong, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 29, 2001.

---

*See footnote, *ante,* page 283.