Filed 8/13/14  Marriage of Steiding CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| In re the Marriage of LISA and B. GARLAND STEIDING, JR.. | |
| LISA STEIDING,  Petitioner and Respondent,  v.  B. GARLAND STEIDING, JR.,  Respondent and Appellant. | A139169  (Sonoma County Super. Ct. No. SFL40257) |

The Steiding's lengthy marriage ended in legal separation in June 2009.  A term of the judgment provided that appellant (Garland)[1] would pay respondent (Lisa) $1,800 per month in spousal support.  The order further provided the support would end upon the death of either party, Lisa's remarriage, her "cohabitation with a person of the opposite sex in the community residence," or further order of the court.

In August 2011, Garland filed a motion contending his obligation to pay support terminated when Lisa commenced her cohabitation with Patrick Baird (Patrick) in the family home.  The trial court found Garland failed to prove cohabitation had occurred.  We affirm.

---

[1] For simplicity and clarity, we refer to the parties by their given names.  We intend no disrespect or undue familiarity.

1

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

*I. Pre-Trial*

The parties were married in April 1986 and separated in February 2008. Their daughter was born in 1994. They also have an older son.

On November 27, 2007, Lisa filed a petition for legal separation.

On June 8, 2009, a stipulated judgment of legal separation was filed, incorporating the parties' marital settlement agreement (MSA). The MSA provides, in part, that Lisa's spousal support of $1,800 per month would automatically terminate upon her "cohabitation with a person of the opposite sex in the community residence located on Calle Ranchero" in Petaluma. The MSA does not define "cohabitation."

On August 29, 2011, Garland filed a motion to modify the June 8, 2009 spousal support order by terminating support based on his allegation that Lisa had been cohabiting with a man at the Calle Ranchero home.

On March 1, 2012, Garland filed a trial brief claiming Lisa's cohabitation was "such that a presumption arises that she has a decreased need for support." In a trial brief filed on April 24, 2012, he argued instead that the cohabitation constituted "the happening of the contingency," terminating his obligation to provide support under Family Code section 4334.[2]

*II. Trial*

*A. Opening Statements*

At the outset of trial, Lisa's counsel indicated he understood Garland's position to be that the clause in the MSA terminating the obligation to provide spousal support had been triggered by Lisa's cohabitation with a person of the opposite sex. He went on to describe cases that have construed the term "cohabitation," and claimed the evidence would show the alleged cohabitation had not occurred.[3]

---

[2] All further statutory references are to the Family Code except as otherwise indicated.
[3] The parties both agreed the relevant issue at trial would be cohabitation.

### B. Lisa's Testimony

Lisa testified that Garland moved out of the family home on Calle Ranchero Drive in Petaluma in February 2008. Thereafter, she had exclusive use of the home up until September 2011. The parties' daughter continued to live with Lisa after the parties separated. Their adult son moved in with her in March 2011 after he returned from military service.

Lisa met Patrick in August 2009 at a retreat for people with cystic fibrosis. He was 32 years old at the time of trial. They began an exclusive romantic and sexual relationship in September 2009. The relationship was continuous up until trial. During their relationship, Patrick has not been employed and he has never owned a home. He is on disability and has had a lung transplant.

Beginning in September 2009, Patrick would stay at the Calle Ranchero home a couple of weekends a month. He lived in Sacramento with his grandmother. During 2010, he would sometimes extend his stay an extra night or two. It is possible that he stayed with Lisa longer than a week at some point that year. The parties' daughter would stay with Garland every other weekend, and Lisa would make the trip to Sacramento to stay with Patrick at his grandmother's house. This visitation pattern remained consistent in 2011. At the most, Patrick spent five consecutive nights at Lisa's home during that year. When he stayed with her, he would help buy groceries.

In March 2011, Patrick began driving a red Volkswagen Jetta. He would typically park in the driveway in front of Lisa's garage. He kept a change of clothes and a toothbrush at her home. He stored the clothes in her bedroom and would bring whatever belongings he needed while he stayed at the house, including his computer, medications, deodorant, and shaver. He and Lisa slept in the same bed and he had access to all areas of the house. He had his own set of keys and could come and go from the house as he pleased, whether or not she was there.

3

Patrick sometimes attended Lisa's soccer league games. The two have taken vacations together to Tahoe and Reno. They spend the holidays together. After she moved to an apartment in September 2011, she gave Patrick a set of keys and he comes and goes from the apartment the same way he did at the Calle Ranchero home. He usually stays with her Thursday to Sunday. She has not made any commitments to him regarding the future of their relationship. She testified to the effect that she and Patrick do not comingle their financial resources.

### C. Patrick's Testimony

At the time of trial, Patrick was living in a shared rental house in Santa Rosa. He confirmed he would often park his Jetta overnight at the Calle Ranchero house. He has been on long-term disability since December 2007. He and Lisa have had an exclusive sexual relationship since September 2009. During 2010 and 2011, he would usually stay at her home from Thursdays through Sundays. There were occasions when he stayed there continuously for over a week. While there, he slept in her bed and had full use of the house. He had the keys and would use them to enter the home when she was at work. He would do chores while she was at work, such as laundry and washing the dishes. Sometimes he would buy groceries and walk her dog.

Patrick brought his clothes with him and kept a toothbrush at the house. He confirmed he attended Lisa's soccer games, as well as her daughter's sporting activities and back-to-school nights. When he was staying with Lisa, the three of them functioned like a "family." He testified that he and Lisa have not made any future plans regarding their relationship.

### D. Richard Hyde

Richard Hyde is a licensed private investigator. Garland hired him in April 2011 to determine if anyone was cohabiting with Lisa. He conducted surveillance on the Calle Ranchero home on 15 different days, beginning May 6, 2011. Patrick's Jetta was parked at the home on 11 out of the 15 days. Hyde concluded Patrick was "cohabiting"

4

with Lisa based on his understanding that people cohabitate when they live together more than 50 percent of the time.

### E.  Peter Whitney

Peter Whitney lives across the street from the parties' home on Calle Ranchero. In 2010 and 2011, he noticed that a man was staying in the home with Lisa.  He appeared to be there "pretty much all the time."  Whitney thought the man was renting out a room. During the week, he would often see the Jetta parked at her residence.

### F.  Garland's Testimony

Garland testified he first met Patrick in late 2009 or early 2010.  He began to suspect Patrick was living with Lisa because he often saw the two of them together. Sometimes he would come to the house and notice Patrick was present.  On one occasion, he went into the house looking for Lisa and found Patrick sleeping in her bedroom.

## III.  Post-Trial Proceedings

In his post-trial brief filed on June 4, 2012, Garland argued the evidence clearly established Lisa had cohabited with Patrick at the Calle Ranchero residence, triggering termination of her right to receive spousal support under the terms of the stipulated judgment of legal separation.  He relied on section 4334, which provides, in part: "If a court orders spousal support for a contingent period of time, the obligation of the supporting party terminates on the happening of the contingency."  (§ 4334, subd. (a).)

Lisa argued in her closing brief that that the "contingent period of time" under section 4334 "does not exist" because there "is no language relating to time for cohabitation to occur."  But even if enforcement of the MSA's provision were to be considered, she asserted no cohabitation had occurred.  She claimed the facts shown at trial were significantly different from the facts stated in the cases Garland relied on.

In his reply brief, Garland relied on *Cochran v. Cochran* (2001) 89 Cal.App.4th 283, in which the appellate court held in a civil law case that cohabitation can exist even when the parties live together for only two to four days a week.

5

On August 24, 2012, the trial court filed its decision denying the motion to terminate spousal support. The court found Lisa and Patrick had maintained a romantic and exclusive relationship since the fall of 2009. Shortly after they met, he would travel from Sacramento to Petaluma on an almost weekly basis, spending approximately three nights contiguous per week at the Calle Ranchero home. After moving from Sacramento to a new residence, he continued to spend approximately three nights per week with Lisa. Notwithstanding these facts, the court concluded this pattern of a relationship was insufficient to trigger the spousal support terminating condition.

The trial court first noted the term "cohabitation" is found in a number of statutes, including those concerning the presumption of parentage found in section 7540, the crime of domestic violence found in Penal Code section 273.5, and the presumptive decreased need for support on account of opposite-sex cohabitation found in section 4323, subdivision (a). The court observed "a common theme appears" in the caselaw construing these statutes, premised on the finding that the two persons were living together. In particular, the court noted the focus in section 4323 is on whether the cohabitation causes a decreased need of support for the supported spouse. The court concluded: "Here, based on the evidence presented at the trail, no evidence was presented that [Lisa's] need for support is somehow lessened by her relationship with Patrick. Each maintained their own residence and there was no testimony that Patrick, other than sharing cost for food, contributed to [Lisa's] living expenses while living in Calle Ranchero." On this basis, the court concluded the spousal support terminating condition had not occurred.

On August 31, 2012, Garland filed a request for a statement of decision.

On February 27, 2013, the trial court filed its statement of decision. The document is essentially identical to the August 24, 2012 decision, except for a new paragraph opining that even if cohabitation had been found, the presumption of a

6

decreased need for support under section 4323 had been rebutted by evidence that Patrick maintained a separate residence and did not contribute to Lisa's finances.

On March 11, 2013, Garland filed a motion for new trial or, in the alternative, a motion to vacate and set aside the decision and enter a new decision terminating Lisa's right to receive spousal support.

On June 3, 2013, the trial court filed its order denying Garland's motion. The order clarifies that the court "did not analyze the issue of any decreased need for support by [Lisa] which would have required an analysis of the [section 4320] factors. The parties had stipulated the only issue to be resolved at trial was that of whether [Lisa] had cohabitated with a person of the opposite sex at Calle Ranchero Drive."

On June 27, 2013, Garland filed his notice of appeal from the February 27, 2013 order.

## DISCUSSION

### I. Standard of Review

" ' "A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error." [Citations.]' " (*In re Marriage of Bower* (2002) 96 Cal.App.4th 893, 898 (*Bower*), italics omitted.)

Garland asserts the standard of review in this proceeding is de novo. " ' "Marital settlement agreements incorporated into a dissolution judgment are construed under the statutory rules governing the interpretations of contracts generally." ' [Citation.] We conduct an independent review of the MSA that is the subject of the appeal. [Citations.] We construe the MSA under the rules governing the interpretation of contracts generally. [Citations.] [¶] As has often been restated: ' "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. [Citation.] If

7

contractual language is clear and explicit, it governs. [Citation.] On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' [Citations.]" [Citation.]' " (*In re Marriage of Hibbard* (2013) 212 Cal.App.4th 1007, 1012-1013.)

As we discuss further below, the term "cohabitation" is ambiguous in that its meaning shifts depending on the legal context in which it is used. For example, it sometimes requires the existence of a romantic relationship, whereas in other contexts a platonic, roommate-type of relationship is sufficient. Thus, whether cohabitation occurred here presents a mixed question of law and fact that "requires a critical consideration, in a factual context, of legal principles and their underlying values." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.) Where the "pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test." (*Ibid.*) Cohabitation is such an issue. (See *In re Marriage of Manfer* (2006) 144 Cal.App.4th 925, 930 [substantial evidence review applies to factual issue of the date of separation].)

"On review for substantial evidence, we examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference. [Citation.] We accept all evidence favorable to the prevailing party as true and discard contrary evidence. [Citation.]" (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1151.) "We do not reweigh the evidence or reconsider credibility determinations. [Citation.]" (*In re Marriage of Dandona & Araluce* (2001) 91 Cal.App.4th 1120, 1126.)

## II. Interpretations of "Cohabitation"

### A. In General

As to the dictionary definition of "cohabitation," the appellate court in *People v. Siravo* (1993) 17 Cal.App.4th 555 (*Siravo*) observed: "The common thread in the definitions is living together. It may be readily concluded that a cohabitant is someone who lives together with another." (*Id.* at p. 561.)[4] In the legal context, "[i]t may be deduced from the Legislature's use of the word " 'cohabit' " (and its variants) and interpretive judicial decisions that cohabitation refers, simply, to people who live or dwell together. In some instances, when the Legislature intended to refer to something more than people living together, it has specified that the cohabitants must have a man-woman relationship, which the courts then interpreted as an intimate or 'significant relationship.' [Citation.]" (*Id.* at pp. 561-562.) It thus appears that the interpretation of what constitutes cohabitation is not static, but is influenced by the context in which the word is used. In the present case, the context is termination of an award of spousal support under section 4334. As that section does not specifically reference "cohabitation" as a condition for termination, we, like the court below, turn to relevant cases and statutes for guidance.

### B. Cohabitation in Intimate Relationships

Section 4323, subdivision (a)(1) provides, in part: "Except as otherwise agreed to by the parties in writing, there is a rebuttable presumption, affecting the burden of proof, of decreased need for spousal support if the supported party is cohabiting with a person of the opposite sex." In deciding whether parties are cohabiting in a manner sufficient to trigger this presumption, courts consider the personal, financial, and residential aspects of

---

[4] "The word 'cohabitant' has been used by the Legislature elsewhere in the codes. In the Domestic Violence Prevention Act, for example, ' "Cohabitant" means a person who regularly resides in the household.' [Citation.] This same definition of a cohabitant--as a person who regularly resides in the household--appears in the Family Code. [Citation.] In regard to housing for senior citizens, ' "Cohabitant" refers to persons who live together as husband and wife.' [Citation.]" (*Siravo, supra,* 17 Cal.App.4th 555 at p. 561.)

the parties' relationship. Cohabitation has been construed to involve a committed personal relationship, which can be sexual or romantic, or a homemaker-companion relationship.[5] (*In re Marriage of Thweatt* (1979) 96 Cal.App.3d 530, 535 (*Thweatt*); *Bower, supra,* 96 Cal.App.4th at p. 901.) Cohabitation also normally involves the sharing of significant finances or labor. (*In re Marriage of Geraci* (2006) 144 Cal.App.4th 1278, 1298-1299 (*Geraci*).)

Garland claims he presented sufficient evidence at trial to establish cohabitation. For purposes of this appeal, we conclude Patrick's part-time presence at the Calle Ranchero home, standing alone, is not determinative. "When the Legislature chose to use 'cohabiting' it was selecting a word of particular legal significance that carries more meaning than two persons of the opposite sex living under the same roof." (*Thweatt, supra,* 96 Cal.App.3d 530 at p. 534.) In *Thweatt* the appellate court found no cohabitation where the wife shared expenses with two male boarders and there was "no evidence of a sexual relationship, a romantic involvement, or even a homemaker-companion relationship between either of the men and wife." (*Id.* at p. 535.) The court also concluded that "cohabitation," as opposed to just "living with," requires more of a showing than the supported spouse and the person of the opposite sex "merely sharing living accommodations." (*Id.* at pp. 534-535.)

Along with an intimate relationship, evidence raising an inference of economic interdependence of some sort appears to be required. In many cases addressing cohabitation, the residential aspect of the relationship involves payment of rent. For example, in *Geraci, supra,* the appellate court found ample evidence of cohabitation where a supported spouse lived with her boyfriend, who provided her with a car and a

---

[5] "The courts have, on numerous occasions, observed that 'cohabitation' does not imply the existence of a sexual relationship between cohabitants, even where the statute specifies that the cohabitants must be 'husband and wife' [citations], 'married' [citation], or 'any person of the opposite sex' [citation]. ' "Cohabitation means simply to live or dwell together in the same habitation; evidence of lack of sexual relations is irrelevant." ' [Citations.]" (*Siravo, supra,* 17 Cal.App.4th 555 at p. 561.)

credit card. She did not pay rent, but contributed domestic services to the household. She allegedly owed her boyfriend more than $30,000 in back rent and other debt, to be repaid when she was financially able to do so. (144 Cal.App.4th 1278 at p. 1299.) As the court in *Geraci* observed: " 'Cohabitation may reduce the need for spousal support because "sharing a household gives rise to economies of scale. [Citation.] Also, more importantly, the cohabitant's income may be available to the obligee spouse." [Citation.]' '[T]he Legislature created the presumption . . . based on thinking that cohabitation . . . creates a change of circumstance so tied in with the payment of spousal support as to be significant enough by itself to require a re-examination of whether such need for support continues in such a way that it still should be charged to the prior spouse.' " (*Id.* at pp. 1298-1299, fns. omitted.) Here, it is undisputed that Patrick did not pay rent and did not provide any domestic services to Lisa in exchange for housing.

Garland contends that cohabitation was established because Patrick resided regularly at Calle Ranchero with Lisa for two years "in a long-term, substantial, stable, committed, romantic, exclusive relationship, 'like a family.' " Claiming cohabiting parties do not need to live together on a full-time basis, he relies heavily on three domestic violence law cases: (1) *People v. Ballard* (1988) 203 Cal.App.3d 311 [although defendant maintained his own separate apartment, the fact that the two were " 'together a lot' " and " 'lived together in one bed' " in a "significant relationship" was held sufficient to establish cohabitation. (*Id.* at pp. 314-315, 320.)]; (2) *People v. Holifield* (1988) 205 Cal.App.3d 993 [" '[C]ohabiting' under [Penal Code] section 273.5 [inflicting corporal injury on a cohabitant] means an unrelated man and woman living together in a substantial relationship--one manifested, minimally, by permanence and sexual or amorous intimacy." (*Id.* at p. 1000.)]; (3) *People v. Moore* (1996) 44 Cal.App.4th 1323 ["We conclude as a matter of law that for purposes of criminal liability under section 273.5, a defendant may cohabit simultaneously with two or more people at different locations, during the same time frame, if he maintains substantial ongoing relationships

11

with each and lives with each for significant periods." (*Id.* at p. 1335.)]. These cases are distinguishable in that they arise in the context of criminal law.

However, Garland correctly notes that when the appellate court in *Cochran v. Cochran* (2001) 89 Cal.App.4th 283, analyzed the meaning of cohabitation, it relied upon the rationale in *Moore, supra,* 44 Cal.App.4th 1323 to support its conclusion that cohabitation does not require evidence that the parties lived together on a full-time basis.[6] Based on that case, he claims "the *Cochran* definition of cohabitation" should apply here. We find the *Cochran* case to be distinguishable.

### C. Analogy to Cohabitation in Palimony Cases

California requires cohabitation as a prerequisite to recovery on a palimony claim. (*Taylor v. Fields* (1986) 178 Cal.App.3d 653, 660-665 [holding that cohabitation was a prerequisite to recovery under *Marvin*].) "Cohabitation is necessary not in and of itself, but rather, because from cohabitation *flows the rendition of domestic services,* which services amount to lawful consideration for a contract between the parties." (*Bergen v. Wood* (1993) 14 Cal.App.4th 854, 858, italics added.) "[I]f cohabitation were not a prerequisite to recovery, every dating relationship would have the potential for giving rise to such claims, a result no one favors," (*ibid.*), because "recovery under *Marvin* 'requires a showing of a stable and significant relationship *arising out of cohabitation.*' " (*Cochran, supra,* 89 Cal.App.4th 283, 291 (*Cochran*), quoting *Bergen, supra,* 14 Cal.App.4th at 857, italics added.)

Requiring cohabitation as an element of a palimony action provides a measure of advance notice and warning to both parties to a relationship, and to their respective family members, that legal and financial consequences may result from that relationship. In that context, cohabitation requires the demonstrable act of setting up a household

---

[6] In *Moore, supra,* 44 Cal.App.4th 1323, the appellate court reasoned that a defendant should not be able to immunize himself from criminal liability for injuring a cohabitant simply because he lived part-time somewhere else with another. (*Id.* at pp. 1333-1335.)

together. Thus, in contrast to an extramarital affair, even a long-term one, cohabitation announces to the ones most affected by the existence of the relationship, the innocent spouse and dependent children, that the defendant has entered into a relationship that may result in significant and long-term impairment of family assets. In the present case, there is little evidence that Lisa and Patrick set up a household together in the Calle Ranchero home. Nor does it appear that any financial consequences resulted from the relationship.

Garland contends that cohabitation can occur on a part-time basis without financial ties between the parties. While *Cochran* does stand for the proposition that cohabitation can occur in the absence of a full-time living arrangement, other factors were present to support the opinion's ultimate conclusion. Specifically, the parties there "had shared a relationship for approximately 17 years. That relationship produced a son, whom they were raising together. They held themselves out to the world as husband and wife. Appellant legally changed her surname to respondent's. They had jointly owned their home until respondent quitclaimed his interest as part of their settlement agreement. Appellant performed a variety of domestic chores for respondent, including raising their son and maintaining the house. Respondent kept clothes at the house, 'spent family time there' and 'slept there on a regular basis.' " (*Cochran, supra,* 89 Cal.App.4th at pp. 291-292.) The appellate court concluded the facts of the relationship, including that the couple lived together two to four days a week both before and at the time they entered their *Marvin* agreement, were "sufficient to raise a triable issue of fact" that they cohabitated under *Marvin, supra,* 18 Cal.3d 660. (*Id.* at p. 293.)

In the present case, it is clear that many of the factors present in *Cochran* are absent. While Patrick did stay at the Calle Ranchero home on a regular basis and had a very close personal relationship with Lisa and her daughter, the parties did not have a child together. Nor did they hold themselves out as husband and wife. They also did not jointly own any property, nor did they share any of their respective financial resources. While there was some evidence that Patrick performed chores and purchased groceries

13

while he was at the home, there is no evidence that these acts were undertaken in exchange for housing.

Cochran is also distinguishable in that it arose in the context of a Marvin claim. The appellate court noted its conclusions were consistent with the purpose of allowing parties to enter into Marvin agreements: "To require nothing short of full-time cohabitation before enforcing an agreement would defeat the reasonable expectations of persons who may clearly enjoy a significant and stable relationship arising from cohabitation, albeit less than a full-time living arrangement. For instance, it would exclude otherwise valid support agreements made by parties who, perhaps because their jobs are geographically far apart, maintain a part-time residence for one party, and also a second residence where at times they live jointly. Certainly the rationale of Marvin does not support such a result." (Cochran, supra, 89 Cal.App.4th at p. 293.) We also note that the Cochran opinion arose in the context of a motion for summary judgment, with the appellate court concluding only that the evidence was sufficient to raise a triable issue of fact as to the cohabitation element of the moving party's Marvin claim. (Id. at p. 291.)

In the present case, it is reasonable to assume the parties understood cohabitation would trigger termination of Garland's obligation to pay spousal support not merely because Lisa maintained an intimate bond with another man, but because that new relationship, at a minimum, raised an inference that Lisa's need for financial support had been affected in some way. Indeed, Garland himself initially argued that Lisa's cohabitation had raised the presumption that she had a decreased need for support. Here, there was essentially no evidence that Lisa's finances were affected in any manner by her relationship with Patrick, notwithstanding the fact that he regularly spent a significant amount of time in her home. Further, we cannot conclude the couple had set up a household together in the Calle Ranchero home as substantial evidence supports the conclusion that Patrick at all times maintained his own separate residence. In view of the

14

totality of the circumstances, we find substantial evidence supports the trial court's finding that Lisa and Patrick's relationship pattern did not amount to cohabitation.

**DISPOSITION**

The judgment is affirmed.

_____
Dondero, J.

We concur:

_____
Margulies, Acting P.J.

_____
Becton, J.[*]

---

[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.