Filed 5/27/15  P. v. Reyes CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B253550 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA094922) |
| v. | |
| HENRY ALINO REYES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur H. Jean, Jr., Judge.  Affirmed.

Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Deputy Attorney General, and Stephanie A. Miyoshi and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

After threatening for several months before to do so, defendant and appellant Henry Reyes (Reyes) carried out his threat and shot and killed Lorena Reyes (Lorena),[1] his wife and the mother of his two young daughters, who was divorcing him. He then shot and critically wounded his 16-year-old stepson. Reyes was convicted of murder, attempted murder, and making a criminal threat against Lorena. Reyes contends the trial court committed reversible error in failing adequately to respond to the jury's request during deliberations for clarification regarding whether heat of passion could negate preexisting malice. He also asserts there is insufficient evidence to support his conviction for making a criminal threat because Lorena never suffered sustained fear. We affirm.

## PROCEDURAL BACKGROUND

In a three count felony complaint, Reyes was charged with murder (Pen. Code,[2] § 187, subd. (a); count 1), attempted willful, deliberate, and premeditated murder (§§ 664, subd. (a), 187, subd. (a); count 2), and criminal threats (§ 422, subd. (a); count 3). As to counts 1 and 2, the complaint also alleged that Reyes personally used and intentionally discharged a firearm, causing great bodily injury or death. (§ 12022.53, subds. (b), (c) & (d).)

Reyes pleaded not guilty and denied the special allegations. A jury found him guilty on all three counts, and found true the firearm use allegations. The court sentenced Reyes to a term of 100 years to life in prison, composed as follows: 25 years to life for count 1, plus 25 years to life for the firearm enhancement; a consecutive term of 25 years to life for count 2, plus 25 years to life for the firearm enhancement; and a concurrent upper term of three years for count 3, to be served concurrently with the other terms imposed. Reyes was also ordered to pay various fees and fines, and awarded credit for time served. He filed this timely appeal.

---

[1] For the sake of narrative clarity and to maintain consistency with the record, we will refer to individual family members other than Reyes by their first names.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

## FACTUAL BACKGROUND

*1.    The Prosecution Case*

*a.    Family circumstances and ongoing marital discord*

Reyes, Lorena, their two young daughters (ages four and seven), and Reyes's stepson Eugene M., lived in a one-bedroom apartment in Long Beach.

In 2008, Reyes and Lorena began working with Phil Harris at the "Budget Law Center" (the Center) in Los Alamitos.[3] Harris assisted Reyes and Lorena in filing for bankruptcy, and interacted with each of them on multiple occasions. Harris described Lorena as pleasant but "very reserved"; she never lost her temper or raised her voice. He described Reyes as a very "Type A" personality, who was typically agitated and nervous. In late 2008 or early 2009, Lorena consulted Harris about having the Center file a divorce petition on her behalf. Harris advised her to wait until the bankruptcy was resolved as marital stress might be relieved once the couple's financial obligations had been discharged. Between 2010 and 2012, Lorena has multiple conversations with Harris about filing for divorce.

In October 2012, Reyes and Lorena had a heated argument about divorce, among other things, in front of the children. At one point, Reyes yelled in a "threatening manner" at Lorena, and told her he would kill her if she divorced him and took the girls.[4] At trial, Eugene testified that Lorena did not seem "that scared" by Reyes's threat, and told Reyes she would call the police and file a report. She told Reyes to move out because their relationship was not working. He said he couldn't leave; he had nowhere to go.

*b.    Lorena initiates a dissolution proceeding*

On November 3, 2012, Lorena retained the Center to file a petition for dissolution on her behalf. That same day, Harris told Reyes that Lorena intended to file for divorce, to which Reyes responded that he would refuse to grant her a divorce. Harris explained that California is a "no fault state and if one party wants a divorce, it will be granted." On

---

[3] Harris is not an attorney but works with most of the Center's clients.

[4] It is this event on which count 3 was based.

November 13, 2012, Lorena signed divorce papers, but told Harris she wanted to await until after the holidays to serve Reyes. On five or six subsequent occasions, Reyes asked Harris to help him convince Lorena not to go forward with the divorce. Reyes's demeanor was always nervous, and he seemed anxious and nervous. This behavior became more exaggerated during the five or six meetings Harris had with Reyes in which they discussed the divorce.

In December 2012, Lorena told Rochele Jacinto, her best friend and coworker, that Reyes had threatened the day before to kill her and her family if she left him. Jacinto testified that Lorena took the threat seriously and was afraid. In December, Lorena told Elizabeth Aguilar, the manager of her apartment complex, that she planned to proceed with the divorce after the holidays.

On February 2, 2013, Lorena and the children left the apartment to stay with Jacinto for a week and a half. Jacinto testified that Lorena moved out of the apartment temporarily because she was afraid of Reyes's reaction once he learned she had filed for divorce. According to Jacinto, Lorena was so afraid Reyes would find her at Jacinto's house that she covered the windows with bed sheets. On February 2, 2013, after discovering Lorena had left the apartment, Reyes admitted to Aguilar that he had threatened to kill his wife if she left him. On February 5, 2013, at Lorena's request, Aguilar served Reyes with the divorce papers. On February 5 or 6, 2013, Reyes asked Harris to represent him in the divorce, but Harris declined. At that point, and during several meetings thereafter, Reyes continued to ask Harris to try to convince Lorena not to proceed with the divorce.

On February 7, 2013, after Reyes moved out of the apartment, Lorena and the children returned. Lorena had the locks on the front door and interior bedroom door changed.

Reyes, who worked nights, continued having nearly daily contact with his daughters. When Lorena was at work, he visited his daughters at the apartment after picking up his older daughter from school, and he took the girls out during the week. A babysitter took care of the girls until Eugene returned from school. Reyes never discussed issues related to child

4

custody with Harris, nor were there any court orders regarding visitation. Reyes continued to persist in asking Harris to try to persuade Lorena not to proceed with the divorce.

At some point in 2012 Reyes obtained a position as an armed security guard. He carried a handgun for which he had a lock box. Reyes usually kept the gun in the trunk of his car, but he sometimes cleaned it in front of the children.

c.      *The crimes*

On Friday, February 22, 2013, Reyes called Harris and asked for an appointment with him as soon as possible. Harris was unable to see Reyes that day, but told him to call at 1:00 p.m. on Monday, February 25, 2013, to schedule an in-person meeting. At 1:15 p.m. on February 25, 2013, Reyes phoned Harris and said, "'I don't need to come in. I believe, I have a plan.'" During the past five years Harris had come to know and care for both Lorena and Reyes. On February 25 he noted a marked changed in Reyes's customary demeanor and tone of voice from any of their prior interactions: "during the conversation [Reyes's] voice was entirely the [antithesis] of what [Harris] learned him to be before that. He was very calm, cool, and collected." Harris asked Reyes if he wanted "'to come in anyway and talk,'" to which Reyes replied, "'No.'"

On February 25, 2013, Eugene arrived home from school about 3:00 p.m. Reyes was at the apartment with his daughters, and both he and the babysitter left when Eugene got home. At about 8:00 p.m., after Eugene had put the girls to bed, Lorena arrived home. She spoke for a time with Eugene, before he went into the bedroom to sleep about 45 minutes later (all family members shared the bedroom).

At about 9:00 p.m., Aguilar opened the security gate of the apartment complex to let Reyes drive through. Reyes parked by the gate and got out. Reyes stood behind the open passenger door, and told Aguilar he was dropping off a car seat for Lorena.

Shortly after getting into bed, Eugene heard a loud knocking on the front door. He heard the door open and heard Lorena say, in a shocked voice, "What are you doing here?" Eugene heard his mother and Reyes argue for about five minutes about the divorce. Reyes urged her to drop the divorce; she refused. Eugene then heard four or five gunshots and heard his mother, who sounded hurt, yell his nickname.

5

Eugene ran from the bedroom to grab a cell phone off a computer table in the living room to call 911. As he did so, he saw Reyes standing by the front door pointing a gun down at Lorena, who was lying on the floor. When Reyes saw Eugene with the phone, he yelled, "Oh, you too." He pointed the gun at Eugene and fired several shots in quick succession before Eugene was able to make a call. After firing the last shot, Reyes kept the gun pointed at Eugene, walked over to him, then turned and left the apartment.

Eugene called 911. When the police arrived they found Lorena, who appeared to be dead, lying on the living room floor a few feet from the front door. She had sustained gunshot wounds to the chest and neck; each was fatal. Lorena was shot from a "distant range," i.e., the distance from the end of the handgun barrel to the skin surface was at least one and a half to two feet, and ranged out to many feet. There was a child's car seat next to Lorena's body.

Reyes's daughters were found in the bedroom. Eugene was in the bathroom, in immense pain. He had been shot in the pelvis and leg, and had sustained life-threatening shots to the abdomen and chest/neck, which required immediate surgery. Eugene's stomach had been ripped open, he had two large holes in his diaphragm, his spleen was shattered and had to be removed and he suffered significant injury to his liver. Eugene remained in the hospital for two weeks, after which he could not walk unaided, and used a wheelchair and walker for about three weeks. Bullets recovered from both Lorena and Eugene were shown to have been fired from Reyes's gun. Bullet casings found in the apartment also came from Reyes's gun.

> d. *Reyes's admission and arrest*

On February 25, 2013, at 10:19 p.m., Reyes left a voicemail message for his acquaintance, Los Angeles Police Department (LAPD) Officer Anthony Lanza stating: "I'm sorry. I just killed my wife and my stepson. I want to surrender to you. Call me back." Lanza listened to the message at 10:30 p.m. and immediately called Reyes. Reyes told Lanza he had shot his wife and stepson an hour before, and wanted to surrender to Lanza. He told Lanza where he could be found (at a 7-Eleven store in East Los Angeles). Lanza

6

notified the LAPD and Long Beach Police Departments (LBPD) of Reyes's admissions and whereabouts.

LAPD officers found Reyes outside the 7-Eleven at 11:39 p.m. He was arrested without incident. A nine-millimeter semiautomatic handgun loaded with one round in the chamber and three rounds in the magazine, a gun case and two additional nine-millimeter magazines loaded with a total of 20 rounds were found in the trunk of Reyes's car which was parked in the lot.

2.    *Defense evidence*

Reyes testified in his own defense. He is a U.S. citizen, and sponsored Lorena's and Eugene's U.S. citizenship. At Lorena's urging, Reyes quit his job to care for their children. He remained unemployed for one and a half years, before taking a job as a security guard. Reyes and Lorena suffered financial difficulties while he was unemployed. The couple argued often and Reyes had a temper. Early in their marriage, Lorena had obtained a restraining order against Reyes.

Reyes worked as a night-time armed security guard, and cared for the children during the day. Reyes received and passed gun safety and first aid training for that job. Before moving out of the family apartment in February 2013, he kept his handgun stored in a locked case in the trunk of his car trunk when off duty. He cleaned the gun inside the apartment, but left the magazine in his car because Lorena told him never to bring a loaded gun into the house. Reyes understood it was safer to bring the gun indoors without the magazine.

Reyes had been upset that Lorena wanted a divorce. He loved her and did not want a divorce, and tried to convince her to remain married for the children's sake. Reyes lived with a coworker for about two weeks after moving out of the family apartment in February 2013, and then lived in his car. Once he began sleeping in his car, Reyes's habit of storing his gun in the trunk changed at night because he felt unsafe. He kept the gun loaded, without the safety activated, underneath his daughter's car seat at night.

Reyes went to the family's apartment on the night of February 25, 2013, because Lorena told him to return their daughter's car seat. He did not go there planning to kill Lorena. Reyes acknowledged that Lorena had her own car seat for their child. Reyes was

7

only able to drive into the apartment complex and park only after Aguilar opened the security gate for him.  He was not working that night and did not wear his uniform, just jeans and a sweatshirt.

Reyes saw his handgun in the car when he removed the car seat.  The safety was activated and the gun was loaded with 10 bullets—nine rounds in the magazine and one in the chamber.  Reyes decided to put the gun in his sweatshirt pocket instead of the glove compartment or trunk because he thought he would only be a few moments, and did not want to leave the weapon in the car.

Reyes knocked twice before Lorena partially opened the door and asked him, "What are you doing here?"  She let him in after he reminded her he was returning the car seat. Once inside, Reyes began talking to Lorena about the divorce.  After about two minutes, their conversation escalated into an argument.  Lorena told Reyes she was divorcing him because they were not getting along, had too many problems and she wanted to take the children.  Reyes denied responsibility for their financial problems, and asked Lorena if she had used him (he suspected she had wanted to bring Eugene to the United States before filing for divorce).  He asked Lorena not to divorce him, and promised to get a different job and do whatever she wanted.  In response, Lorena said, "I'm going to file the divorce no matter what.  You are never going to see your kids no more.  I'm going back to the Philippines," and told Reyes to leave.

Reyes "snapped" when Lorena told him he could not see his daughters.  He was so mad he heard a buzzing noise in his ears.  Reyes did not remember what happened next.  All he remembered was seeing Lorena and Eugene bleeding on the floor and looking at the gun in his hand.  He put the gun to his head to shoot himself, but Lorena stopped him and told him to take care of their children.  Reyes did not remember whether he shot Lorena before shooting Eugene.  Eugene was in the bedroom when Reyes and Lorena argued, and did not provoke the shooting.  Reyes did not recall saying anything to Eugene before shooting him.

Reyes left the apartment without rendering first aid to Lorena or Eugene.  He did not call 911 because he was afraid and did not want the police there.  As he was driving on the freeway, Reyes called Lanza and left him a message saying he had just killed his wife and

stepson. When Lanza returned his call, Reyes asked to be picked up at the 7-Eleven so he could surrender. When LAPD officers took Reyes into custody, he told them he had shot his wife and stepson. The police found his gun and ammunition magazines in the trunk.

Reyes denied having threatened to kill Lorena in October 2012. Once, during an argument over the divorce, he told her that "if you going to take my kids, you would rather kill me or we are all going to die. It is better over my dead body . . . . I told her that in the event she does, she should call the police." Reyes talked to Harris several times about the divorce, but denied telling him on February 25, 2013, that he "had a plan" and no longer needed to meet with him.

On the night of the shooting, Reyes told a LBPD detective that after Lorena said she was going to take the children, Eugene blocked him from entering the bedroom to get his daughters. At trial, Reyes conceded that he lied to the detective and made that scenario up because he did not recall what happened at the time of the shooting.

3.      *The jurors' questions and the court's response*

The jury received standard (CALJIC) instructions regarding: the concurrence of act and specific intent (No. 3.31); murder (No. 8.10); malice aforethought (No. 8.11); deliberate and premeditated murder (No. 8.20); unpremeditated second degree murder (No. 8.30); second degree murder resulting from an unlawful act dangerous to life (No. 8.31); sudden quarrel or heat of passion, and provocation (No. 8.42); cooling off period for sudden quarrel or heat of passion (No. 8.43); no single specific emotion constitutes heat of passion (No. 8.44); and, as pertinent here, the distinction between murder and manslaughter (No. 8.50[5]). During deliberations, the jury submitted two questions to the court:

---

[5] CALJIC No. 8.50: Murder and manslaughter distinguished:

"The distinction between murder [other than felony-murder] and manslaughter is that murder [other than felony-murder] requires malice while manslaughter does not.

"When the act causing the death, though unlawful, is done [in the heat of passion or is excited by a sudden quarrel that amounts to adequate provocation,] [or] [in the actual but unreasonable belief in the necessity to defend against imminent peril to life or

"(1) If we have evidence from the past of malice aforethought, does heat of passion or sudden quarrel exempt a person from previous malice aforethought"; and

"(2) Can you define heat of passion or sudden quarrel?"

In response to the first question (both questions were read and addressed in the presence of the jury, counsel and Reyes), the trial court stated: "I think that you are confusing malice aforethought with premeditation and deliberation and previous consideration." The court explained that, "Malice aforethought is the mental state that must go along with the act which results in the killing of a human being for it to be murder. [¶] Malice aforethought is of two kinds. The first is express malice aforethought and what that is, is a specific intent to kill." The trial court explained the two types of malice. First, it addressed express malice:

"How do you know somebody has a specific intent to kill? You look at the circumstances surrounding the commission of the act from which you can interpret whether there was a specific intent to kill. [¶] Sometimes it is easy. The killer will say, 'I'm going to kill you' bang. Sometimes it is—it is almost as easy but not quite as easy.

"The victim is lying on the ground and the killer takes a 20-pound sledge hammer, raises it way up in the air, and comes smashing down on the victim's head. [¶] What do you think? Specific intent to kill? I don't know. And, then, there are all sorts of permutations. [¶] And what we are doing is asking you to think about these things and come to conclusions as to what the facts are."

The court used another hypothetical to explain implied malice:

"So express malice aforethought is a specific intent to kill. There is an implied malice aforethought where the killer has no intent to kill but he or she acts with knowing that the

---

great bodily injury,] the offense is manslaughter. In that case, even if an intent to kill exists, the law is that malice, which is an essential element of murder, is absent.

"To establish that a killing is murder [other than felony-murder] and not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done [in the heat of passion or upon a sudden quarrel] [or] [in the actual, even though unreasonable, belief in the necessity to defend against imminent peril to life or great bodily injury]."

10

natural consequences of the act are dangerous to human life.  Imag[in]e driving down Ocean Boulevard with your window open tossing hand grenades out the window.  Pulling the pin and tossing it out.  Keep driving and tossing it out.  [¶]  I didn't want to kill anybody.  Did you think you might?  I do.  What do you all think?"  [¶]  So those are the malice aforethought is that mental state either specific intent to kill or disregard for human life, which is implied malice at the time of the act of killing.  [Sic.]"

The court tried to illustrate the distinction between malice aforethought and premeditation and deliberation with yet another example:

"Now, you can come up with all sorts of ways to kill.  You set a trap for your brother-in-law and it is a big hole in the ground and you cover it up with leaves and bushes so he will walk on that path and fall into the hole in the ground.  [¶]  In the bottom of the hole . . . you have these wooden stakes sticking straight up and they are all pointed and there is a tiger down there, too.  [¶]  So you know your brother-in-law is going to fall into that pit, be impaled on the stakes, and clawed to death and ripped apart by the wild animal and you set this up two or three days ahead of time.  [¶]  At the time your brother-in-law dies, because you have set that all up, is that malice?  Is that malice aforethought, even though you did it two or three days earlier?  What do you think?"

"So malice aforethought is the thought, mental state that has to accompany whatever act it is that results in the killing of a human being.  Malice aforethought has nothing to do with premeditation and deliberation."

Returning to its previous instruction defining malice aforethought (CALJIC No. 8.11), the trial court reiterated that, "'The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person,'" and reminded the jury that "'malice  . . . . [has] a very special meaning.'"  Quoting from the same instruction, the court stated, "'[T]he word "aforethought" does not imply deliberation or the lapse of considerable time.  It only means that the required mental state must precede rather than follow the act,'" and added that, "malice aforethought is a mental state that is required to be present in the act of killing somebody for it to amount to a legal murder."

11

Referring to the jury's inquiry about "previous malice aforethought," the court said, "I'm not sure what you are referring to and I'm not going to get into the details of this case." It then used an example to illustrate the distinction between malice aforethought and premeditation and deliberation:

"But [malice aforethought] has nothing to do with deliberation and premeditation. They are different and separate things. If you think about it, you can think for a long time about killing somebody, premediating [sic] and deliberating or you can do it in a very short period of time. Very short; very short. [¶] The law doesn't undertake to measure in units in time seconds, minutes, hours, days, months, how long the thinking or the premeditation or deliberation must occur. [¶] It can happen quickly. It can happen over a long period of time. You know we have lots of gang crimes here in Long Beach and in Los Angeles, Orange County."

"I must tell you that many of the homicide cases that I hear involve gang killings, criminal street gang context. [¶] And one case I had not too, too long ago, a gang member was walking down the street and he had a gun in his pocket. [¶] It was a loaded gun and he is from a certain gang sect; and as he walked and he came to a building and he turned the corner into an alley and there was a member of another gang, a rival gang right there and so our gang member pulled his gun and shot and killed him. [¶] Premeditation and deliberation? He didn't, he didn't think about . . . the act very long . . . . He was . . . almost instantaneous. [¶] But what he had thought about for a long time was what would happen in various gang context as though gang members talk among each other and develop their way of living and dying. [¶] So they are there. In his head he had established this is the way I behave under these circumstances and he shot and killed. [¶] I could probably come up with all sorts of scenarios and so could all of you. I know I look at you. What have I got? Several hundred years of adult life and life experience in front of me. You can come up with all sorts of things."

"So premeditation and deliberation can be a very quick thing. It can be a long thing and we look to you for your judgment as to whether it exists in this case. [¶] So I think, Mr. Foreperson, I think the tenor of your question suggests to me that you have interposed

malice aforethought with the idea of premeditation and deliberation. [¶] Do you think so in your view? You might."

In response, the foreperson stated his belief that "the clarification is more on for the voluntary manslaughter," and asked the court to "define heat of passion." The court responded: "What does the word 'sudden' mean? Sudden quarrel. Sudden. It is happening right now. So does previous thinking about killing somebody, does that have any, does that take away the suddenness of things?" The court returned to a previous hypothetical: "What about my gang member? Very sudden event out there in the street. All the thinking that had gone into being a gang member. What do gang members do? I have a loaded gun, so forth and so on." The court cautioned that its role was not to tell jurors what or how to decide, and went on to observe:

"It really isn't and your decision is okay with me." [¶] But you have to put some thought into that. How do you compare sudden with something that you have been thinking about for a long period of time. [¶] So does sudden quarrel exempt a person from previous premeditation and deliberation? You answer that. It is your judgment we look to for that."

"Now, you asked, 'Can you define heat of passion or sudden quarrel.' No. All I can say to you is that, and I'm turning to [CALJIC No. 8.42]: [¶] 'To reduce an unlawful killing from murder to manslaughter on the ground of sudden quarrel or heat of passion, the provocation must be of the character and degree, the kind as naturally would excite and arouse the passion and the assailant must act under the influence of that sudden quarrel or heat of passion." [¶] The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances."

The court explained that " . . . it is the reasonable person standard not a defendant's standard and we ask you to figure out what is a reasonable person's standard," and gave the following example:

"A woman who believes in her right to pack a firearm and she does in her purse. [¶] And she comes home expecting to find her six-year-old and the babysitter and unlocks the front door and walks in and there is the babysitter all tied up and duct tape[d] and there is a

13

man touching her child.  [¶]  She pulls a firearm and kills him.  Did she have a right to?  Maybe not.  Would that make me angry if I walked in on something like that happening to my child?  I bet your boots.  [¶]  Would it be reasonable for me to be angry and to act out of anger?  I look to your judgment.  What do you think?  And you can come up, you can come up with scenarios.  All of you can."

The trial court concluded, "All we can give you is the broad outline and ask you to use your judgment in coming up with this."  In conclusion, the court asked, "Does that help?," to which the foreperson replied, "Yes; I believe so."  The jury was told to resume deliberations and ask more questions, if necessary.  The court again admonished the jury to "remember I can't decide the case for you.  [¶]  It is your duty to decide this case, if you can, also, your privilege to decide this case and I respect that."

Reyes's counsel lodged no objections before, during or after the court's explanation to or exchange with the jury.  The jury submitted no further questions, and returned unanimous verdicts within two hours.

## DISCUSSION

*1.     Jury instruction*

*a.       Forfeiture*

On request of a deliberating jury, the trial court must instruct "on any point of law arising in the case."  (§ 1138; *People v. Ross* (2007) 155 Cal.App.4th 1033, 1047, [§ 1138 imposes mandatory duty on court to clear up deliberating jury's misunderstanding].)  "The court need not always elaborate on the instructions already given if they were "'full and complete.'"  (*Ross*, at p. 1047; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1213.)  The "court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.  [Citations.]  Indeed, comments diverging from the standard are often risky.  [Citation.]"  (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)  The court "should decide as to each jury question whether further explanation is desirable . . . ."  (*Ibid.*)  No reversal is in order for violation of section 1138, absent a showing of prejudice.  (*Ibid.*)

14

Reyes contends that the jury, clearly struggling, asked "a straightforward and insightful question:" whether, if it found Reyes killed Lorena in the heat of passion, that would negate malice even if Reyes had intended to kill her when he went to her apartment. The question of whether "heat of passion or sudden quarrel [would] exempt a person from previous malice aforethought" clearly raises "point[s] of law arising in the case," (§ 1138) on which the jury explicitly sought guidance. Reyes contends that the trial court's situational hypotheticals constituted an inadequate and prejudicial response to the jury's question: He argues that the court's "response to the jury was confusing and did not address the question. . . . [¶] The court should have instructed the jury that if it found [Reyes] operated under heat of passion when he killed [Lorena], malice was negated regardless of when it was formed. The ultimate question in this regard is under what intent [Reyes] was operating when he fired the shots. [¶] If [he] intended to kill [her] when he walked up to the apartment and shot her pursuant to that intent, there would be no heat of passion involved. If, on the other hand, he intended to kill her when he walked up to the apartment, but killed her in the heat of passion, malice would be negated." Reyes argues the court's purportedly illustrative examples in response to the first question did nothing to clarify the jury's confusion.[6]

Reyes never objected or proposed any modification to the court's lengthy response to the jury's question. Accordingly, we agree with the Attorney General that Reyes's contention that the court failed to provide the requisite clarification is forfeited. "Where, as here, appellant consents to the trial court's response to jury questions during deliberations, any claim of error with respect thereto is waived." (*People v. Bohana* (2000) 84 Cal.App.4th 360, 373; *People v. Marks* (2003) 31 Cal.4th 197, 237 [forfeiture may be found where the court responds to an inquiry with a correct and germane statement of the law, and the defense proposes no further clarification].) Reyes's counsel's implicit approval of the court's response to the jury's inquiry bars Reyes from arguing on appeal that a further or different response was required. If Reyes desired such a response, he should have proposed it. (See *People v. Medina* (1990) 51 Cal.3d 870, 902.) The forfeiture rule applies both to claimed

---

[6] Reyes does not challenge the court's response to the jury's second question.

15

violations of constitutional rights and to asserted state law errors. (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 465.)

Reyes acknowledges, as he must, that "'[o]rdinarily, an appellate court will not consider a claim of error if an objection could have been, but was not, made in the lower court.'" He argues in his Reply brief that this rule should not obtain here and that "[e]ven though [he] failed to object to the instructional errors at trial, he has not forfeited his right to raise those issues on appeal" for several reasons: (1) he cannot be expected to have raised an objection, because it would have been futile to do so; (2) the issues should be reviewed so he need not bring a habeas petition for ineffective assistance of counsel; (3) the errors involve incorrect jury instructions; and (4) the forfeiture rule does not apply to issues involving a defendant's substantial rights.

For reasons of fairness, courts generally decline to address, and deem forfeited, issues first raised by an appellant in a reply brief. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [claim of ineffective assistance of counsel raised by defendant for the first time in reply brief is forfeited]; *People v. Alvarez* (1996) 14 Cal.4th 155, 241, fn. 38 ["'perfunctorily'" rejecting defendant's claim of ineffective assistance of counsel, perfunctorily made for the first time in his reply brief in a single paragraph]; *People v. Barragan* (2004) 32 Cal.4th 236, 254, fn. 5 [declining to address an argument raised by the Attorney General for the first time in reply brief].) "'Withholding a point until the reply brief deprives the respondent of an opportunity to answer it . . . . Hence, a point raised for the first time therein is deemed waived and will not be considered, unless good reason is shown for failure to present it before. No good cause is shown here.' [Citation.]" (*People v. Clayburg* (2012) 211 Cal.App.4th 86, 93.)

In any event, Reyes's arguments fail. First, Reyes has offered no analysis or argument that suggests, let alone demonstrates, that it would have been futile for his trial counsel to object to the court's response to the jury's question. Nor is there any support for his contention that he received ineffective assistance of counsel. To show ineffective assistance of counsel, a defendant must show that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and he was

prejudiced by counsel's deficient performance.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.)  The burden of proving ineffective assistance of counsel falls squarely on the defendant.  (*People v. Babbitt* (1988) 45 Cal.3d 660, 707.)  On appeal, "a reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the appellate record affirmatively discloses that counsel had no rational tactical purpose for his act or omission.'" (*People v. Frye* (1998) 18 Cal.4th 894, 979–980, disapproved on another ground, by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  Where, as here, the "'record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citation.]'" (*People v. Hart* (1999) 74 Cal.App.4th 479, 486.)  Absent an explanation in the record, we will not speculate that Reyes's trial counsel's  failure to present a particular defense resulted from incompetence. "To justify relief, [Reyes] must be able to point to something in the record showing that counsel had no satisfactory rationale for what was done or not done." (*People v. Pope* (1979) 23 Cal.3d 412, 426, fn. 16.)  Reyes has made no such showing.  In sum, Reyes claims his attorney was ineffective for not objecting.  However, deciding whether to object is inherently tactical, and a failure to object rarely establishes ineffective assistance.  (*People v. Riel* (2000) 22 Cal.4th 1153, 1197.)  Nothing in the record demonstrates this is one of those rare instances.

There is also no merit to Reyes's assertion that the jury received erroneous instructions resulting in a violation of his substantial rights.  "[F]ailure to object to instructional error forfeits the objection on appeal unless the defendant's substantial rights are affected." (*People v. Mitchell*, *supra*, 164 Cal.App.4th at p. 465; § 1259.)  "'Substantial rights'" are equated with errors resulting in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818." (*Mitchell*, at p. 465.)

First, as discussed above, the jury received the appropriate, thoroughly-vetted CALJIC instructions.  Reyes posed no objection to, nor did he request modification of, the court's use of illustrative hypotheticals to illustrate terms and concepts regarding to clarify the jury's confusion.  Where, as here, the original instructions are themselves full and

17

complete, the court has discretion under section 1138 to determine how to best aid the jury, and what additional explanation will satisfy the jury's request for information. (*Beardslee*, *supra*, 53 Cal.3d at p. 97.) The court's response to the jury's inquiry is reviewed for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 745–746.)

Here, the jury was instructed on the necessity that it find a union of act and specific intent (CALJIC No. 3.31). The jury was further instructed, pursuant to CALJIC No. 8.20, that requisite intent had to accompany the act of killing: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree." The jury was further instructed that "murder" required a finding that the "killing was done with malice aforethought" (CALJIC No. 8.10), and that "'aforethought'" means only that the requisite mental state must precede (not follow) the act. The instructions regarding sudden quarrel and heat of passion eliminate the requisite element of malice aforethought necessary to establish murder, by requiring that killing "must have occurred while the slayer was acting under the direct and immediate influence of the quarrel or heat of passion." (CALJIC Nos. 8.42, 8.43.) These instructions correctly state the law. Reyes does argue otherwise.

Given the wording of the inquiry, the trial court reasonably believed the jurors had confused the relationship between the concepts of malice aforethought and premeditation and deliberation. (Cf. *People v. Thompkins* (1987) 195 Cal.App.3d 244, 250–251 [jury's inquiry of "[c]an sudden heat of passion nullify premeditation," likely sought guidance on whether defendant who objectively encounters provocation of his "passion" but has already formed the premeditated intent to kill before the provocation is nonetheless guilty of first degree murder].) Accordingly, in response to the jury's question, the court clarified that "[m]alice aforethought is the mental state that must go along with the act which results in the killing of a human being for it to be murder," repeated the definition of malice aforethought, and gave illustrative examples of this principle, contrasting it with the concept of premeditation and deliberation.

18

The question was answered and the jury was apparently satisfied with the trial court's response. After concluding its response, the court asked the foreperson if its explanation had helped. The foreperson replied, "Yes; I believe so." The court then sent the jurors back to resume their deliberations, letting them know they were free to ask additional questions. The jury did not seek further clarification or guidance. (Cf. *People v. Butler* (2009) 46 Cal.4th 847, 876–877 [finding defendant's failure to object to trial court's response to jury question constituted forfeiture of claim of error, and noting that jury sought no further clarification notwithstanding the court's invitation to ask additional questions, if necessary].) In sum, Reyes waived this claim by implicitly agreeing to the court's response. In no sense were his substantial rights affected so as to obviate the necessity of an objection pursuant to section 1259. Although it was invited to seek further clarification by the court, the jury asked no further questions. Evidently, the court resolved the jury's confusion, fulfilled its duty under section 1138 and accurately conveyed the applicable law. (*People v. Boyce* (2014) 59 Cal.4th 672, 700; *People v. Rigney* (1961) 55 Cal.2d 236, 245–246.)

2.    *Harmless error*

In any event, even if the trial court erred—it did not—we would find Reyes suffered no prejudice. (Cf. *People v. Najera* (2006) 138 Cal.App.4th 212, 225 [rejecting claim of ineffective assistance of counsel for failure to object to prosecutor's misstatements as evidence did not properly present issue of sudden quarrel or heat of passion].) Provocation is the factor that distinguishes "heat of passion" voluntary manslaughter from murder. "The provocation which incites a defendant to engage in homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim . . . must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59.) The test is objective. (*Id*. at p. 60.)

Here, evidence of provocative conduct by Lorena was scant at best. The record reflects that Reyes and Lorena frequently argued about the divorce and that as many as three or four months before the killing, Reyes threatened to kill Lorena if she divorced him and

19

took their children. The only significant difference between their earlier disagreements and the discussion that escalated quickly into an argument on February 25, was that Reyes came to that meeting with a loaded gun and followed through on his threat to kill Lorena.

The record contains substantial evidence of premeditation and deliberation. During all his prior meetings with Harris, Reyes had acted nervous, agitated and upset, especially when discussing the divorce. He called Harris the preceding Friday wanting to meet immediately. Yet, on Monday, Reyes calmly informed Harris he no longer needed to meet with him to discuss the divorce, because "[he had] a plan." Further, even though Reyes had just spent the afternoon with his daughters at Lorena's apartment, and knew Lorena had her own car seat for the child, he returned to the apartment late at night when he knew Lorena would be home, ostensibly to return a car seat. Reyes purposefully brought with him, hidden in a pocket, a loaded handgun, which he could easily have hidden in the glove box or trunk of his car, as he had regularly done in the past. He brought the loaded weapon even though Lorena told him never to bring a loaded gun into the apartment, and even though it was unlikely anyone could steal the weapon from his locked car parked behind a security gate and from which he planned to be away only moments. Further, the jury could reasonably find that Reyes's testimony that he "snapped" when Lorena told him he would not be able to see his daughters was not credible. Although they frequently discussed the divorce, Reyes never discussed child custody issues with Harris, and there were no court orders in place regarding custody or visitation. Lorena's purported threat to keep him from his children is also not credible, in light of the fact that he saw his daughters almost daily.

After aiming for and shooting Lorena and Eugene in their vital organs, Reyes chose not to call 911 because he did not want police at the apartment. Instead, he drove off leaving his two young daughters alone with what he then believed were the dead bodies of their mother and brother, and calmly left a message for Lanza. The record does not indicate that Reyes was under the influence of any """"violent, intense, high-wrought or enthusiastic emotion"""" when he killed Lorena. (See *People v. Breveman* (1998) 19 Cal.4th 142, 163.) Further, Reyes later lied to the police to cover his crime, saying Eugene had tried to block his access to his daughters.

20

This evidence does not indicate Reyes acted in sudden response to provocation. It shows a man motivated by anger or pride, who acting willfully, in a deliberate and premeditated manner, to carry out his "plan" for revenge. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [passion for revenge will not reduce murder to manslaughter].) Given the strong evidence supporting Reyes's murder conviction and the very weak evidence of legally adequate provocation, no different result was reasonably probable. Thus, we conclude that, even if the jury had received different instructions, there was no reasonable probability Reyes would have received a more favorable outcome. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1132 ["Based on the strength of that evidence, there is no reasonable probability that the jury would have reached a different result had it been given the clarifying instruction"]; *People v. Garcia* (2008) 168 Cal.App.4th 261, 292; *People v. Siravo* (1993) 17 Cal.App.4th 555, 563.) Under the harmless error test, it is not "reasonably probable" that Reyes would have obtained a more favorable outcome at trial. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) The jury found Reyes's murder of Lorena and attempted murder of Eugene were willful, deliberate, and premeditated acts. The record supports that finding. The jury necessarily resolved against Reyes his claim that he acted in the heat of passion. (*People v. Wharton* (1991) 53 Cal.3d 522, 572 [finding of deliberation and premeditation "manifestly inconsistent" with acting in the heat of passion].)

3.      *Terrorist threat*

In October 2012, Reyes threatened to kill Lorena if she filed for divorce. Section 422 makes it a crime to "willfully threaten[ ] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety . . . ." Of the five elements of the crime, Reyes takes issue only with the evidentiary record as to the fourth element—arguing

21

only that the evidence was insufficient to prove that Lorena was in sustained fear as a result of the October 2012 threat.[7]

In a single paragraph in his opening brief, Reyes proclaims the "evidence failed to show [Lorena] was in sustained fear as a result of the October-2012 threat. Admittedly, once she filed for divorce, she was in fear for her safety, particularly when she moved out of the apartment. However, there was no evidence that she was in fear for her safety prior to filing for divorce."

Reyes simply asserts that Lorena did not fear for her safety before she filed for divorce. Defendant provides no citation to legal authorities or analysis of this issue. Thus, the issue is waived. (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 ["Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider the issues waived."].) "An appellate court is not required to examine undeveloped claims, nor to make arguments for parties." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) Our role is to evaluate "legal argument with citation of authorities on the points made." (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Even if Reyes had adequately briefed the issue, we would affirm: the record contains substantial evidence that Reyes's threat caused Lorena to be in sustained fear for her safety. Although Eugene testified that his mother did not seem "that scared" by Reyes's October 2012 threat to kill her, the jury was entitled to disbelieve him and find instead that Lorena's manner was mere bravado assumed for the benefit of her children who witnessed the

---

[7] The elements of a violation of section 422 are: (1) "the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person'"; (2) "the defendant made the threat with the specific intent that the statement . . . be taken as a threat, even if there was no intent actually to carry it out"; (3) "the threat . . . was 'on its face, and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat'"; (4) "the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety'"; and (5) "the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228.)

frightening event. Reyes's threat was quite specific and dependent on the occurrence of a single condition—he would kill Lorena if she filed for divorce. (See *People v. Wilson* (2010) 186 Cal.App.4th 789, 814–815 [finding custodial officer was reasonably in sustained fear of inmate's threat where he learned inmate was scheduled for parole in 10 months]; see also *People v. Butler* (2000) 85 Cal.App.4th 745, 752 ["A threat is sufficiently specific where it threatens death or great bodily injury."].) Lorena, who knew Reyes had a gun, told her best friend she took her husband's threat seriously and was afraid of him. Lorena remained so afraid of Reyes that in February 2013 when she arranged to have Reyes served with the divorce petition, she and the children went into hiding at Jacinto's house, covering the windows with sheets so Reyes could not find her. Further, according to the apartment manager, as soon as Lorena returned to the apartment after Reyes moved out, she immediately had the locks changed on both the apartment and interior bedroom doors. The testimony of these witnesses alone is sufficient to establish the fourth element of section 422. Clearly, Lorena's fear persisted lasted long past October 2012, when Reyes threatened to kill her. As our Supreme Court has made clear, "unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Substantial evidence supports the criminal threat conviction.

23

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.